**WALLING v. JAMES V. REUTER, Inc.**

**Civ. A. No. 578.**

District Court, E. D. Louisiana,
New Orleans Division.

March 31, 1943.

James H. Hynes, of Nashville, Tenn., for plaintiff.

Normann & Rouchell, of New Orleans, La., for defendant.

BORAH, District Judge.

This is a suit brought by the Administrator to enjoin respondent from violating provisions of the Fair Labor Standards Act of 1938, 52 Stat. 1060, 29 U.S.C.A. § 201 et seq. The material facts are these:

### Findings of Fact

1. The defendant is, and at all times since October 24, 1938, the effective date of the minimum wage, overtime compensation, and record-keeping requirements established by the Fair Labor Standards Act of 1938, 52 Stat. 1060, 29 U.S.C.A. § 201 et seq., hereinafter referred to as the Act, has been a corporation existing by virtue of the laws of the State of Louisiana, with its principal office and place of business at 817 Decatur Street, New Orleans, Louisiana, where it engages in purchasing, receiving, handling, selling, and distributing, at wholesale, fresh vegetables, fruits, and similar produce. Defendant employs from 10 to 15 employees, including office help, warehousemen, truck drivers, and laborers in carrying on its business.

2. Defendant purchases approximately 50% of the produce handled by it from

out-of-state sources. These produce are usually shipped to it by railroad, in carload and half-carload lots, and the refrigerated cars carrying the goods are switched to a siding approximately one block from defendant's place of business, known as the "Reuter Switch". An average of twelve to twenty freight cars a month, carrying produce consigned to defendant, arrive at the "Reuter Switch" from points outside of the State of Louisiana.

3. All the vegetables and produce arriving from out-of-state sources are unloaded from the freight cars and brought to defendant's place of business to be uncrated and examined before being sold. Defendant's employees, principally a carman and truck drivers and occasionally warehousemen unload the produce from the freight cars and truck it to defendant's place of business. The carman spends the greater portion of his time engaged in the unloading operations. Truck drivers usually spend one and one-half hours a day, sometimes longer, in unloading freight cars and hauling the produce to defendant's place of business.

4. Defendant sells its produce to other wholesalers and to retail merchants in Louisiana and other states. Though the bulk of goods is sold to local merchants, substantial out-of-state sales amounting to approximately 5% of the total yearly sales are made to out-of-state customers. In the year 1939 out of total sales amounting to $201,829, the sales to out-of-state customers amounted to $11,450. In the year 1940, total sales aggregated $198,994, with out-of-state sales amounting to $15,885. In 1941 and 1942, total sales aggregated $245,084 and $448,758, respectively, while out-of-state sales for those years were $12,028 and $18,915.

5. Defendant's warehouse employees sort, select, repackage, and handle produce received without distinction as to its ultimate destination. Orders are made up from stock on hand, and an average of twelve a day are shipped to out-of-state customers. Usually a Railway Express Company truck comes by defendant's place of business each day, and the out-of-state orders are loaded thereon by the defendant's employees.

6. In the normal course of its business, defendant also sells substantial amounts of vegetables and produce to ship chandlers. Such sales occur every week. The ship chandlers purchase the produce to provision boats for ocean-going voyages, and usually in amounts sufficient to last until the boats reach their next port of call. The bulk of the produce purchased by ship chandlers is picked up by them in their own trucks at defendant's place of business. However, defendant's own truck drivers frequently deliver orders for boats docked in the New Orleans Harbor. Sometimes these orders are just unloaded at the docks, sometimes they are unloaded onto runners and onto winches and immediately pulled or hoisted aboard the boat. On rare occasions the defendant's employees carry the produce on the boats themselves. The ship chandlers who purchase these produce do not specifically advise defendant of the destination and proposed use thereof.

7. Because of their perishable nature, there is a very rapid turnover of the produce and goods handled by defendant. In general, all goods received from out-of-state sources are unloaded, examined, sorted, repackaged, sold and delivered within one to five days after they are acquired by defendant. This rapidity of movement is exemplified by defendant's custom of using the refrigerated freight cars in which goods are received as a temporary night storage place for produce that may be on hand at the end of the day. The freight cars are always fully unloaded and released within two to five days after arrival.

8. During the period from October 24, 1938 to July 1940, defendant paid many of its employees rates less than the prevailing minima of 25¢ and 30¢ per hour specified by the Act. Defendant's books during this period show only the total weekly salaries paid to employees. The hours worked by warehousemen, carmen, and truck drivers, ranging from 55 to 75 hours a week, were far in excess of what their salaries would cover at the minimum rates prescribed by the Act.

After July, 1940 defendant's records were changed and purported to show that employees received at least the minimum wage for all hours worked. However, I find that employees worked longer hours than were credited to them on defendant's books, and as a consequence still were receiving less than the minimum wage prescribed.

9. From October 24, 1938 until July, 1940 defendant paid no additional amounts for overtime compensation for hours in excess of 44 and 42 per week. Office and warehouse employees who were entitled to overtime compensation because of the long

hours they worked during this period received none.

After July 1940 defendant's books purport to show overtime payments to some employees but since employees worked longer hours than they were credited with by defendant their compensation did not adequately cover the overtime work done by them at the overtime rate prescribed by the Act.

10. From October 24, 1938 until July, 1940 defendant kept no daily or weekly records of the hours worked by its employees as required by the Administrator's Regulations.

After July, 1940 defendant kept what purported to be time records for employees, but I find that employees were not actually credited with all hours which they worked.

11. As a result of several inspections made by the Wage and Hour Division during the period involved in this suit, defendant was well aware of the provisions of the Fair Labor Standards Act. However, defendant has consistently contested the applicability of the Act to its employees and has taken the position in this suit that the coverage of the Act does not extend to a wholesaler operating its business in the manner in which the defendant operates.

## Conclusions of Law

1. The court has jurisdiction of the parties hereto and of the subject matter of this action. 29 U.S.C.A. § 217.

2. Those employees of defendant who unloaded produce from freight cars coming from out-of-state sources; those who hauled such produce from the freight cars to defendant's place of business and there unloaded it;[1] those who prepared and shipped orders to out-of-state customers;[2] and those who prepared and delivered orders to ship chandlers for provisioning of vessels on their voyages,[3] were intimately connected with and a part of commerce, as defined by Section 3(b) of the Fair Labor Standards Act, and were engaged in commerce within the meaning of Sections 6 and 7 of said Act and entitled to the benefits thereof.

3. The employees of defendant who sorted, picked over, handled, packaged, and repackaged produce in defendant's place of business without regard to the final destination thereof, part of said goods being regularly shipped to out-of-state customers in the normal course of defendant's business, were producing goods for commerce within the meaning of Section 3(j) of the Act and were entitled to the benefits of Sections 6 and 7 thereof.[4]

4. The fact that the ship chandlers to whom defendant sold produce did not specifically notify defendant that such produce was to be used for provisioning boats on their ocean-going voyages is not controlling. What is important is that defendant's employees spent a substantial portion of their time working on such goods which did move outside the state and defendant cannot escape the impact of the Act by a claim of ignorance where as here it had every reason to anticipate and expect that the goods would move from the state to a place outside thereof.[5]

5. Because of the rapidity in turnover of produce received from out-of-state sources due to their perishable nature and the defendant's method of handling them, there was a continuity of movement of such goods from out-of-state to defendant's customers, whether local or distant, and all employees of defendant were an integral part of that movement and were engaged in commerce within the meaning of the Act.[6]

6. The Act applies generally to employees of an employer who handles goods without reference to their ultimate destination, some being selected for shipment interstate and some intrastate according to the daily demands of business. Congress was not unaware that it would be practically impossible without disrupting

---

[1] Walling v. Jacksonville Paper Co., 63 S.Ct. 332, 87 L.Ed. —, decided Jan. 18, 1943.

[2] Walling v. Goldblatt Bros., Inc., 7 Cir., 128 F.2d 778; and see Enterprise Box Co. v. Fleming, 5 Cir., 125 F.2d 897, certiorari denied Enterprise Box Co. v. Holland, 316 U.S. 704, 62 S.Ct. 1312, 86 L.Ed. 1772; Hamlet Ice Co. v. Fleming, 4 Cir., 127 F.2d 165, certiorari denied 63 S.Ct. 29, 87 L.Ed. —.

[3] Atlantic Company v. Walling, 5 Cir., 131 F.2d 518.

[4] Fleming v. Kenton Loose Leaf Tobacco Co., D.C., 41 F.Supp. 255.

[5] Warren-Bradshaw Drilling Co. v. Hall, 317 U.S. 88, 63 S.Ct. 125, 87 L. Ed. —, decided Nov. 9, 1942.

[6] Walling v. Jacksonville Paper Co., supra.

the distribution business to restrict the application of the Act to those cases where a definite intention can be proved that particular pieces of goods, fruit, vegetables, or anything else shall move later on in interstate commerce.[7]

7. Employees of a wholesaler engaged in obtaining goods from points outside the state and distributing them to points in other states are engaged in the stream of interstate commerce and entitled to the benefits of the Fair Labor Standards Act.[8]

8. By paying its employees who were engaged in commerce and in the production of goods for commerce at rates less than the minima prescribed in the Act, defendant has violated Sections 6 and 15 (a) (2) of the Fair Labor Standards Act of 1938, 29 U.S.C.A. §§ 206, 215(a) (2).

9. By paying its employees who were engaged in commerce and in the production of goods for commerce at rates less than one and one-half times the minimum rates prescribed by the Act, or less than one and one-half times their regular rate of pay, whichever was greater, for hours worked in excess of 44 hours per week from October 24, 1938 through October 23, 1939, and for hours worked in excess of 42 hours per week from October 24, 1939 to October 23, 1940, and for hours worked in excess of 40 hours per week thereafter, defendant has violated Sections 7 and 15(a) (2) of the Fair Labor Standards Act of 1938, 29 U.S.CA. §§ 207, 215 (a) (2).

10. By its failure to make, keep, and preserve records setting forth the information required to be recorded by Regulations of the Administrator which became effective October 24, 1938, and amendments thereto; and, more particularly by its failure to record the hours worked each work day and each work week by each employee until July, 1940, and by failing to credit employees for all hours worked thereafter, defendant violated the provisions of Sections 11(c) and 15(a) (5) of the Fair Labor Standards Act of 1938, 29 U.S.C.A. §§ 211(c) and 215(a) (5).

11. By shipping to out-of-state customers goods produced by its employees who were receiving less than the minimum and overtime rates prescribed by the Fair Labor Standards Act, defendant violated Section 15(a) (1) thereof, 29 U.S.C.A. § 215(a) (1).

12. Because of defendant's course of violations of the Act over a long period of time, and then mere semblance of compliance under official pressure of the Wage and Hour Division inspectors, coupled with defendant's present contention that the Act is not applicable to it; and upon the whole record, the plaintiff is entitled to the relief sought in the complaint herein.[9]

The plaintiff is entitled to injunction in accordance with the foregoing findings of fact and conclusions of law, and proper order and judgment providing therefor may be presented after notice.

---

[7] United States v. F. W. Darby Co., 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430.

[8] Stafford v. Wallace, 258 U.S. 495, 42 S.Ct. 397, 66 L.Ed. 735, 23 A.L.R. 229.

[9] Walling v. Jacksonville Paper Company, supra.